UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

In re:  NEWS PUBLISHING COMPANY,        :
        a Georgia corporation,          :        Chapter 11
                                        :        Case 13-40002
                                        :
        Debtor.                         :
_____ :
NEWS PUBLISHING COMPANY,                :
                        Movant          :
v.                                      :
                                        :
SYNOVUS BANK,                           :
f/k/a Columbus Bank & Trust, as Successor :
in interest to Citizens First Bank, a Division of :
Synovus Bank through Name Change        :
and by Merger with Citizens First Bank, :
a Division of Synovus Bank,             :
And GREATER ROME BANK,                  :
                                        :
                Respondents             :

**MOTION FOR AUTHORITY TO USE CASH COLLATERAL
ON AN INTERIM AND ONGOING BASIS, TO PROVIDE ADEQUATE PROTECTION,
AND FOR EXPEDITED HEARING ON USE OF CASH COLLATERAL ON AN
INTERIM BASIS AND AQEQUATE PROTECTION**

COME NOW NEWS PUBLISHING COMPANY, Debtor and Movant herein, and

hereby files this motion seeking (i) authority to use cash collateral on an interim and

ongoing basis and to provide adequate protection and (ii) an expedited hearing on use of

cash collateral on interim basis and adequate protection, respectfully showing the following:

1.

The above-styled bankruptcy case (the "Chapter 11 Case") was commenced by the filing

by Debtor of a voluntary petition for relief in this Court under Chapter 11 of the Bankruptcy

Code 11 U.S.C. §§1 101 *et seq.* on January 1, 2013 ("Petition Date").

2.

Debtor is Debtor-in-possession in the Chapter 11 Case, and continues to operate its business.

3.

Debtor currently publishes one (1) paid daily paper, five (5) paid weekly newspapers, seven (7) free newspapers, shoppers and niche publications and six (6) newspaper and niche websites located in urban, suburban and rural markets. Cherokee Publishing Company, Inc., an Alabama corporation ("Cherokee") is a wholly owned subsidiary of Debtor. Cherokee currently publishes one (1) paid daily paper. Debtor also operates a substantial commercial printing operation. The Debtor's and Cherokee's publications, websites and printing businesses (collectively, the "Business") are a fully-functional going concern that provides services to meet the needs of their customers.

4.

On or about December 1, 2009, Debtor executed a Promissory Note in favor of Greater Rome Bank in the original principal amount of $896,394.51 (the "Greater Rome Note"). The Greater Rome Note is secured, *inter alia,* by that certain Commercial Security Agreement, dated December 1, 2009 (the "Greater Rome Security Agreement") and that certain Uniform Commercial Code Financing Statement indexed by the Georgia Uniform Superior Courts Clerk's Cooperative in File No. 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, as continued pursuant to that certain Uniform Commercial Code Financing Statement indexed by the Georgia Uniform Superior Courts Clerk's Cooperative in File No. 057-11- 1611 (the "Greater Rome Financing Statement") (the Greater Rome Note, the Greater Rome Security Agreement and the Greater Rome Financing Statement are hereinafter collectively referred to as the "Greater Rome Loan Documents"). News' obligations to Greater Rome Bank under the Greater Rome Note are secured by a first-priority lien on all inventory,

chattel paper, accounts[1], equipment and general intangibles of News (collectively, the "Collateral") pursuant to the Greater Rome Loan Documents.  True and correct copies of the Greater Rome Loan Documents are attached hereto as Exhibit 1.

5.

On or about June 28, 2012, Debtor executed a Universal Note and Security Agreement in the original principal amount of $851,000.00 (hereinafter collectively referred to as the "Citizens First Loan Documents") in favor of Citizens First Bank, a Division of Synovus Bank ("Citizens First Bank"). Citizens First Bank has caused to be filed that certain Uniform Commercial Code Financing Statement indexed by the Georgia Uniform Superior Courts Clerk's Cooperative in File No. 033-2009-03746 (the "Citizens First Financing Statement"). True and correct copies of the Citizens First Loan Documents and the Citizens First Financing Statement are attached hereto as Exhibit 2.

6.

By virtue of the Citizens First Loan Documents, Citizens First Bank has a security interest in the pre-petition accounts receivable of Debtor. By virtue of the Greater Rome Loan Documents, Greater Rome Bank has, or may have, a security interest in the pre-petition accounts receivable of Debtor.

7.

At the time of commencement of the Chapter 11 Case, Debtor was generating monthly revenues of approximately $1,000,000.00 which revenues are, or may be, cash collateral as defined in Bankruptcy Code §363(a) ("the Cash Collateral.")

---

[1] Pursuant to that certain Subordination Agreement, dated  April 15, 2009, Greater Rome Bank has subordinated its security interest in accounts receivable to the security interest  of Citizens First Bank to the extent of seven hundred and fifty thousand and no/100 dollars ($750,000.00).

8.

Debtor requires the use of the Cash Collateral in the ordinary course of the continued operation of its business. Debtor seeks Court authorization, pursuant to 11 U.S.C. §363, to use Cash Collateral to pay its reasonable and customary expenses for the operation of its business.

9.

A Consolidated Monthly Operating Statement for 2013 indicating monthly expenses and cost of the Business is annexed hereto as Exhibit 3 (the "Budget").

10.

Debtor requires the immediate use of Cash Collateral on an interim basis for the payment of ordinary expenses incurred on a daily basis that are essential to the ongoing operation of the Business, which expenses must be paid from Cash Collateral, and an expedited hearing on the use of Cash Collateral is required to obtain approval of same.

11.

Without the use of Cash Collateral, Debtor will be unable to operate the Business and will be unable to effectively reorganize.

12.

Debtor proposes that this Court allow the Respondents replacement liens on the post-petition receivables of Debtor to the extent and validity of each of the Respondents' respective pre-petition liens on cash collateral.

13.

News also requires the continued use of certain Greater Rome Bank Collateral in order to continue the ongoing operation of the Debtors' businesses.  Without the use of such Collateral, the Debtors' operations would be substantially impaired.

14.

It is in the best interest of the Chapter 11 estate that Debtor be permitted to utilize Cash Collateral and to make adequate protection payments to the Respondents as provided in the Budget or under such other terms and conditions as this Court may determine to be just and equitable.

15.

Debtor submits herewith as Exhibit 4 a proposed order approving the interim use of Cash Collateral, and providing for the payment of adequate protection, as provided by Bankruptcy Rule 4001(b)(1)(A.)

WHEREFORE, Debtor prays that this Court

A.   Set this matter for an expedited hearing to determine the terms and conditions for an interim order authorizing the use of Cash Collateral and providing for payment of adequate protection;

B.   Set this matter for a final hearing to determine the terms and conditions for an order authorizing Debtor's use of Cash Collateral on an Interim Basis and the payment of adequate protection on an ongoing basis;

C.      Grant Debtor such other and further relief as the Court determines to be just and equitable.

This 3rd day of January, 2013.

Counsel for the Debtor and Movant

By:_____

J. Nevin Smith
Georgia Bar No. 661110
jsmith@smithconerly.com

Smith Conerly LLP
402 Newnan Street
Carrollton, GA 30117
770-770-834-1160 (Telephone)
770-770-834-1190 (Facsimile)

EXHIBIT "1"

Greater Rome Loan Documents

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $896,394.51 | 12-01-2009 | 11-21-2012 | 194340869 | 1796/ 18 | | 03 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** News Publishing Company (TIN: 68-0410700)
PO Box 1633
Rome, GA 30162

**Lender:** Greater Rome Bank
Main Office
1490 Martha Berry Blvd
P.O. Box 529
Rome, GA 30162-0529

---

**Principal Amount: $896,394.51**                                      **Date of Note: December 1, 2009**

**PROMISE TO PAY.** News Publishing Company ("Borrower") promises to pay to Greater Rome Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Ninety-six Thousand Three Hundred Ninety-four & 51/100 Dollars ($896,394.51), together with interest on the unpaid principal balance from December 1, 2009, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 7.000% per annum based on a year of 360 days, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 35 regular payments of $10,500.00 each and one irregular last payment estimated at $698,975.84. Borrower's first payment is due December 21, 2009, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on November 21, 2012, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payment will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Greater Rome Bank, Main Office, 1490 Martha Berry Blvd, P.O. Box 529, Rome, GA 30162-0529.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 7.000% of the unpaid portion of the regularly scheduled payment or $50.00, whichever is less, regardless of any partial payments Lender has received.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 16.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees, if any sums owing under this Note are collected by or through an attorney at law, whether or not there is a lawsuit, and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Georgia without regard to its conflicts of laws provisions. This Note has been accepted by Lender in the State of Georgia.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 or five percent (5%) of the face amount of the check, whichever is greater, if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: Inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated December 1, 2009.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives,

Loan No: 194340569

**PROMISSORY NOTE**
**(Continued)**

Page 2

successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: GREATER ROME BANK P.O. BOX 629 1490 MARTHA BERRY BLVD ROME, GA 30162-0629.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties waive any right to require Lender to take action against any other party who signs this Note as provided in O.C.G.A. Section 10-7-24 and agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

BORROWER:

NEWS PUBLISHING COMPANY

By: _____(Seal)
Burgett H. Mooney, III, CEO of News Publishing
Company

LASER PRO Lending, Ver. 6.46.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - GA  G:\PLPL\PROFMA\1033.FC  TR-15377  PR-62

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $896,394.52 | 12-01-2009 | 11-21-2012 | 194340569 | 1769748 | | 03 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Grantor: News Publishing Company (TIN: 58-0410700)
PO Box 1633
Rome, GA 30162

Lender: Greater Rome Bank
Main Office
1490 Martha Berry Blvd
P.O. Box 529
Rome, GA 30162-0529

---

THIS COMMERCIAL SECURITY AGREEMENT dated December 7, 2009, is made and executed between News Publishing Company ("Grantor") and Greater Rome Bank ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become unenforceable.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral. Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

Removal of the Collateral. Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Georgia, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

Transactions Involving Collateral. Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

| Loan No: 194340569 | Page 2 |
|---|---|

be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Inspection of Collateral. Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

Taxes, Assessments and Liens. Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

Compliance with Governmental Requirements. Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

Hazardous Substances. Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

Maintenance of Casualty Insurance. Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

Application of Insurance Proceeds. Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

Insurance Reserves. Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

Insurance Reports. Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

Financing Statements. Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS. Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

| | |
|---|---|
| Loan No: 194340569 | Page 3 |

Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Georgia Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 194340569                                                                                               Page 4

---

enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Georgia without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Georgia.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means News Publishing Company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means News Publishing Company.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Greater Rome Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by News Publishing Company in the principal amount of $896,394.57 dated December 1, 2009, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS**



## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 194340569                                                                                      Page 5

TERMS. THIS AGREEMENT IS DATED DECEMBER 1, 2009.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

NEWS PUBLISHING COMPANY

By: _____ (Seal)
Burgett H. Mooney, III, CEO of News Publishing
Company

LASER PRO Lending, Ver. 5.43.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - GA  L:\PLA\LAMCPFIL\LAXPL\LPC  TR-10777  PR-C1

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "Agreement") is made as of the 20th day of December, 2012 (the "Effective Date") between **NEWS PUBLISHING COMPANY**, a Georgia corporation ("News Publishing"), **BURGETT H. MOONEY, III**, an individual resident of Georgia ("Mooney") (News Publishing and Mooney, collectively, the "Obligors"); and **GREATER ROME BANK**, a Georgia Bank (the "Bank"; Obligors and Bank, collectively, the "Parties").

## R E C I T A L S:

A.    News Publishing is indebted to Bank (the "News Publishing Loan") as evidenced by the Promissory Note dated December 1, 2009 from News Publishing to Bank (the "News Publishing Note"), said News Publishing Note being secured, _inter alia_ by the December 1, 2009 Commercial Security Agreement made by News Publishing in favor of Bank (the "Security Agreement") and guaranteed by the December 1, 2009 Guaranty made by Mooney (the "Mooney Guaranty") in favor of Bank;

B.    News Publishing also is indebted to Bank as evidenced by the Business Loan Agreement dated December 1, 2009 between News Publishing and Bank, said Business Loan Agreement (the "Business Loan Agreement") being secured, _inter alia_ by the Security Agreement and guaranteed by the Mooney Guaranty (the News Publishing Note, the Business Loan Agreement, the Mooney Guaranty and the Security Agreement shall collectively be referred to as the "Loan Documents");

C.    Mooney is indebted to Bank as evidenced by the Mooney Guaranty;

D.    Obligors each are in default in the payment and performance of certain provisions of the Loan Documents; and

E.    Bank and Obligors now wish to enter into this Agreement to memorialize their agreement regarding the News Publishing Loan and the Loan Documents.

## A G R E E M E N T:

NOW, THEREFORE, in consideration of the mutual obligations and agreements set forth herein, and Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    _Recitals._  The foregoing recitals are confirmed by the Parties as true and correct and are incorporated herein by reference.  The recitals are a substantive, contractual part of this Agreement.

2.    _Conditions Precedent to This Agreement._  The following are conditions precedent to the effectiveness of this Agreement:

(a)    The Parties shall have executed and delivered to one another this Agreement in a form approved by the Parties and shall have executed and delivered all other documentation identified in this Agreement as being required by Bank.

(b)    The Parties have properly executed the certain final judgment attached hereto as **Exhibit "A"** (the "Final Judgment"); and

1

Active 20216573v3

(c)     The Parties have properly executed those certain Consent Order and Writ of Possession attached hereto collectively as **Exhibit "B"** (the Consent Order and Writ of Possession collectively referred to herein as the "Writ of Possession Order").

3.      <u>Waiver of Claims</u>.  In consideration of, <u>inter alia</u>, Bank's performance of its obligations hereunder, Obligors hereby agree not to sue upon or prosecute, and hereby release and discharge Bank from, any and all claims and causes of action, in tort or contract or of any other kind or character, whether known or unknown and whether now existing or hereafter arising, that have at any time been owned, or that are hereafter owned, that arise out of any one or more circumstances or events that occurred prior to the Execution Date and that are related to the Loan.   For purposes of this <u>Section 3</u>, "Bank" shall mean Bank and its affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each of their respective directors, shareholders, officers, agents, servants, employees, attorneys, financial advisors, branches, affiliates, subsidiaries, predecessors, successors and assigns and all persons, firms, corporations, and other representatives and organizations acting on behalf of any of them.  By way of example and not limitation, Obligors specifically waive any and all rights to appeal the Final Judgment or otherwise seek to have the Final Judgment set aside.  The provisions of this sub-section shall survive the consummation of the transactions contemplated by this Agreement or any termination of this Agreement.

4.      <u>Covenant to Forbear on Enforcement of the Final Judgment and Writ of Possession Order</u>.  The Final Judgment and Writ of Possession Order having been submitted to the Court for approval, entered and filed on the civil docket, Bank covenants to refrain, through and including January 3, 2012, 2013 from collecting or enforcing the Final Judgment and/or Writ of Possession Order.

5.      <u>Acknowledgment of Security Interest, Default and Amounts Due</u>.

(a)     Obligors acknowledge and agree that one or more events of default exist under the News Publishing Note, the Business Loan Agreement and the Mooney Guaranty, including, without limitation, the failure to make scheduled payments thereunder.

(b)     Bank and Obligors acknowledge and agree that the outstanding amounts due and owing under the News Publishing Note, the Business Loan Agreement and the Mooney Guaranty as of December 7, 2012 are as follows:

     i.      Principal due $768,596.31; and

     ii.     Interest due $59,032.46; and

     iii.    statutory attorney fees under O.C.G.A.  § 13-1-11 in the amount of $124,144.31.

(c)     Obligors expressly acknowledge and agree that their obligations to Bank under the News Publishing Note, the Business Loan Agreement and the Mooney Guaranty are secured by Bank's first priority security interest in News Publishing's Inventory, Chattel Paper, Accounts[1], Equipment and General Intangibles (collectively, the "Collateral"), pursuant to the Security Agreement.

(d)     Obligors expressly acknowledge and agree that nothing in this Agreement shall be construed as a release or waiver by Bank of its security interest in the Collateral, and Obligators expressly

---

[1]  Bank has subordinated a portion of its security interest in accounts receivable of News Publishing to Citizens First Bank pursuant to the terms of the Subordination Agreement, executed by Greater Rome on April 15, 2009 (the "Subordination Agreement").

acknowledge that such security interest in the Collateral shall continue following the execution of this Agreement, the Final Judgments, and the Writ of Possession Order.

6.     Payment Obligations.     In consideration of Bank's agreement not to enforce its rights and remedies under the Security Agreement so long as Obligors are fully complying with the terms of this Agreement and no Events of Default (as defined in Paragraph 12) have occurred, Obligors jointly and severally agree to pay Bank $2,500 per month, for a period of 60 consecutive months, beginning on January 2, 2012. Payments shall be received by 5:00 p.m. EST on the first business day of each month. Payments shall be made by certified funds to Greater Rome Bank, P.O. Box 529, Rome, Georgia 30162-529, Attn: David Lance. So long as Obligors are complying with the terms of this Agreement, including the terms of this Paragraph 6, Bank will not seek to enforce its rights under the Security Agreement the Final Judgments, and the Writ of Possession Order. Bank shall at all times, however, be permitted to enforce any and all other rights and remedies under the Mooney Guaranty, the Final Judgments or any of the other Loan Documents.

*[handwritten in left margin: January 2, 2013]*

7.     Advertising Credit.     In further consideration for this Agreement, News Publishing agrees to provide Bank with a $250,000 advertising credit (the "Advertising Credit"), for use in any of the publications owned or operated by News Publishing or its successors, in the sole discretion of Bank. The Advertising Credit shall expire on January 2, 2018. The rates to be charged to Bank against the Advertising Credit shall be no higher than the lowest rates for the same or similar advertising space provided to any other advertiser in the publications owned or operated by News Publishing or its successors.

8.     Agreement on Value of Collateral.     Bank and News Publishing acknowledge and agree that the present, non-liquidation market value of the Collateral is $235,000.00 (the "Collateral Value") and that the present value of the consideration provided for herein, including the present value of the cash payments to be received by Bank hereunder and the Advertising Credit (collectively, the "Bank Consideration"), is equal to the Collateral Value. News Publishing expressly agrees that it will not oppose the Collateral Value in any bankruptcy proceeding under Title 11 of the United States Code, whether in any pleading filed with the court, during any hearing or otherwise. News Publishing further agrees that it will advocate for the Collateral Value in any matter or hearing in a bankruptcy proceeding commenced by News Publishing under Title 11 of the United States Code, specifically including but not limited to hearings on adequate protection, valuation, or plan confirmation. News Publishing and Bank acknowledge and agree that should the Collateral Value not be approved by the Bankruptcy Court in any matter or hearing in a bankruptcy proceeding commenced by News Publishing under Title 11 of the United States Code filed by News Publishing, this Agreement shall be null and void, the parties' obligations hereunder shall terminate, and the parties shall be restored to their respective positions, including all rights and remedies, as they existed prior to the execution of this Agreement. Notwithstanding the parties' agreement as to the Collateral Value, Bank expressly preserves and Obligors hereby acknowledge the full value of its claim under the Loan Documents.

3

Active 20216573v3

9.     <u>Support for Sale or Plan in Bankruptcy of News Publishing.</u>   Bank agrees that it will support any plan, motion (including any motion for the sale of News Publishing's assets) or other matter in a bankruptcy proceeding commenced by News Publishing under Title 11 of the United States Code (a "<u>News Publishing Bankruptcy</u>"), specifically including but not limited to adequate protection, valuation, sale of assets or plan confirmation which (i) continues Bank's contractual rights to receive the Bank Consideration provided for in this Agreement and (ii) results in Bank retaining its security interest in the Collateral until Bank has received the Bank Consideration in full.

10.    <u>Adequate Protection.</u>   News Publishing and Bank acknowledge and agree that monthly payments to Bank in the amount of $2,500 each shall constitute acceptable adequate protection for News Publishing's continued possession and use of the Collateral following any petition filed by News Publishing under Title 11 of the United States Code.  News Publishing agrees to support any motion filed by Bank requesting such monthly payment as adequate protection pursuant to 11 U.S.C. § 506.

11.    <u>Cash Collateral.</u>   For purposes of any motion filed by News Publishing in a News Publishing Bankruptcy seeking authority from the bankruptcy court to use cash collateral, pursuant to 11 U.S.C. §§ 363 and 364, Bank agrees to accept a second priority lien on News Publishing's post-petition cash collateral to the same extent as Bank's lien on pre-petition Accounts Receivable pursuant to the Subordination Agreement, provided however, that Bank's agreed upon treatment for purposes of cash collateral shall not be less than the Bank would otherwise be entitled pursuant to 11 U.S.C. U.S.C. §§ 363 and 364.

12.    <u>Representations and Warranties.</u>

In order to induce Bank to execute, deliver, and perform this Agreement, Obligors, as applicable, hereby warrant and represent to Bank that:

(a)    They have read and fully understand the terms of this Agreement and agree to be legally bound by it;

(b)    They have full and complete authority to make the settlement provided herein and to execute this Agreement;

(c)    The execution of this Agreement by Obligors and the performance by Obligors of their obligations hereunder will not violate or result in a breach or constitute a default under any agreements to which any of the Obligors is a party;

(d)    The consideration received by Obligors for this Agreement is fair, reasonable, sufficient, just and adequate and constitutes lawful consideration supporting the execution of the Agreement;

(e)    Obligors acknowledge that there may be tax liability incurred by Obligors in connection with the terms of this Agreement, and such parties agree to be responsible for payment of any tax liability resulting therefrom, and the Bank has made no representations, and offered no advice or opinion, concerning the tax consequences of this Agreement;

(d)    Obligors expressly warrant and represent that Obligors have not assigned or in any way conveyed, transferred or encumbered all or any portion of the claims released by it herein; and

4

The representations and warranties contained in this Section 8 shall survive the consummation of the transactions contemplated by this Agreement or any termination of this Agreement.

(e)      In entering into this Agreement, Obligors and Bank hereby stipulate, acknowledge and agree that Bank gave up valuable rights and agreed to forbear from exercising legal remedies available to it in exchange for the promises, representations, acknowledgments and warranties of Obligors as contained herein and that Bank would not have entered into this Agreement but for such promises, representations, acknowledgments, agreements, and warranties, all of which have been accepted by Bank in good faith.

(f)      Obligors have been represented by independent counsel in negotiating and entering into this Agreement, and agreeing to the waivers set forth in this Section 9, and all of the above terms and conditions have been freely bargained for and are all supported by reasonable and adequate consideration and the provisions herein are material inducements for Bank entering into this Agreement.

13.      Events of Default.

(a)      The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(i)      Any representation or warranty made herein by any of the Obligors was at the time made, untrue, incorrect or misleading in any material respect; or

(ii)      A failure by Obligors to make any payment required by this Agreement, and the continuance of such failure for a period of ten (10) calendar days after written notice of such failure from Bank to Obligors, with such notice provided by Bank to Obligors via facsimile to the representative designated by Obligors in this Agreement to receive notices;

(iii)      A breach or default by any of the Obligors in the performance of any covenant, obligation, or agreement contained in this Agreement other than a failure by Obligors to make any payment required by this Agreement; or

(iv)      Obligors expressly acknowledge and agree that execution of this Agreement, including any payments made hereunder, the Final Judgments, or the Writ of Possession Order do not constitute voidable transfers pursuant to section 5 of Title 11 of the United States Code or similar state law.  If any payment made pursuant to this Agreement, or the execution and/or recording of this Agreement, the Final Judgments, or the Writ of Possession Order, is deemed to be a preference, fraudulent transfer or other voidable transfer pursuant to section 5 of Title 11 of the United States Code or similar state law, whether by order of a court of competent jurisdiction or otherwise, or if Bank is required by order of a court of competent jurisdiction to refund or surrender all or any part of any such payment or transfer to any person or entity for any reason, then Obligors shall not be entitled to receive credit for any such payment or transfer, including interest paid by Bank including attorneys' fees, costs, and expenses paid or incurred by Bank, against the Bank Consideration.  Notwithstanding the avoidance or recovery of any payment or transfer made by Obligors to Bank under this Agreement, the Loan Documents shall continue in full force and effect or be reinstated, as the case may be, automatically and without notice or action of any kind by the Parties, and shall apply to any and all amounts so refunded or surrendered by Bank, any interest paid by Bank and any attorneys' fees, costs and expenses paid or incurred by Bank in connection with any such event.

5

14.    <u>Miscellaneous</u>.

(a)    This Agreement may be executed in any number of identical counterparts which, taken together, shall collectively constitute one (1) agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the party to be charged.

(b)    This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their heirs, executors, administrators, successors, legal representatives, and assigns; provided that, without Bank's prior written consent, which may be granted or withheld in Bank's sole and absolute discretion, Obligors may not assign any of their rights or obligations under this Agreement or under any of the Loan Documents.

(c)    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF GEORGIA AND FEDERAL LAW, AS APPLICABLE.

(d)    The terms and conditions set forth in this Agreement are the product of joint draftsmanship by all Parties, each being represented by counsel, and any ambiguities in this Agreement or any documentation prepared pursuant to or in connection with this Agreement shall not be construed against any of the Parties because of draftsmanship.

(e)    The Parties agree that all provisions of the Loan Documents specifically intended to survive expiration or earlier termination of the Loan Documents or this Agreement shall survive.  The Parties also agree that all limitations periods under this Agreement and/or any of the Loan Documents are hereby tolled through and including January 1, 2017.

15.    <u>FINAL AGREEMENT</u>.    EXCEPT AS SET FORTH HEREIN, THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR ORAL OR WRITTEN, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS AMONG THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

EXECUTED under seal as of the Effective Date.

[Signature Pages Follow]

EXHIBIT "2"

Citizens First Loan Documents

| | | |
|---|---|---|
| NEWS PUBLISHING COMPANY<br>305 E 6TH AVE<br>ROME, GA 30161 | Citizens First Div Synovus Bank<br>1148 BROADWAY<br>COLUMBUS, GA 31901 | Loan Number _730007502/13_<br>Date _11/29/2011_<br>Maturity Date _2/29/2012_<br>Loan Amount $ _851,000.00_<br>Renewal Of _730007502/13_ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of _Eight Hundred Fifty One Thousand_
_Dollars and Zero Cents_____ Dollars $ _851,000.00_____.

☐ **Single Advance:** I will receive all of this principal sum on _____ . No additional advances are contemplated under this note.
☒ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
   **Conditions:** The conditions for future advances are _UPON REQUEST OF CUSTOMER AND APPROVAL OF LOAN OFFICER_

   ☒ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all other
      conditions and expires on _____2/29/2012_____ .
   ☐ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.
**INTEREST:** I agree to pay interest on the outstanding principal balance from _____11/29/2011_____ at the rate of _6.000_ %
per year until _the index rate changes_____ .
☒ **Variable Rate:** This rate may then change as stated below.
   ☒ **Index Rate:** The future rate will be _1.000000% above_____ the following index rate: ·
      Lender's Prime, which is the base rate used by Lender to set interest rates at which loans are made to various customers. Loans may be made at,
      above or below said prime rate.
   ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
   ☒ **Frequency and Timing:** The rate on this note may change as often as _Daily_____ .
      A change in the interest rate will take effect _when the index rate changes._____ .
   ☒ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____18.000_ % or less than
      _6.000_ %. The rate may not change more than _____ % each _____ .
   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   ☒ The amount of each scheduled payment will change.      ☐ The amount of the final payment will change.
   ☐ _____
**ACCRUAL METHOD:** Interest will be calculated on a _Actual day/360 day year_____ basis.
**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
   ☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).
   ☒ at a rate equal to _16.000_____ .
☒ **LATE CHARGE:** I agree to pay a late charge on the portion of any payment not made within _10_____ days after it is due equal to
   _5% of the unpaid amount with a minimum of $100.00_____ .

☒ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☒ are not included in the principal amount
   above: _See Disbursement Authorization_____
☐ **PREPAYMENT FEE:** If I prepay the entire balance of this loan after the original note date ("OND"), I agree to pay a prepayment fee equal to
   ☐ _____ % of the outstanding principal balance ("OPB") If the loan is prepaid_____ year(s) after the OND, ☐ _____% of OPB if
   prepaid _____ year(s) after the OND, ☐ _____ % of OPB if prepaid _____ year(s) after the OND, ☐ _____ % of OPB if prepaid
   _____ year(s) after the OND; and ☐ _____ % of the OPB if prepaid _____ year(s) after the OND.
**PAYMENTS:** I agree to pay this note as follows:
3 Monthly Interest payments beginning December 29, 2011. The final payment of the entire unpaid balance of principal and interest will be
due 2/29/2012.

**PURPOSE:** The purpose of this loan is _90 day short term renewal interest only_____ .
**ADDITIONAL TERMS:**
This loan is secured by the Personal Guaranty of B H Mooney, III, Mary Banks and Elizabeth Mozley.   This Note amends and restates that
certain Note dated July 28, 2011. This Note is not a new contract or obligation, and is not a discharge or satisfaction of the referenced Note,
and as such Note may have been previously or otherwise amended, renewed, modified,and/or restated.

**SIGNATURES AND SEALS: IN WITNESS WHEREOF, I HAVE SIGNED MY NAME AND AFFIXED MY SEAL ON THIS** _29th_____ **DAY OF**
_November, 2011_____ **. BY DOING SO, I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGES 1, 2, AND 3). I**
**HAVE RECEIVED A COPY ON TODAY'S DATE.**
NEWS PUBLISHING COMPANY
Signature(s) for Borrower(s):                                         Signature(s) for Borrower(s):

_____ (SEAL)        _____ (SEAL)
B H MOONEY III, President

_____ (SEAL)        _____ (SEAL)

_____ (SEAL)        _____ (SEAL)

| DISPOSITION OF FUNDS | | (Optional) | |
|---|---|---|---|
| | | Signed _____ For Lender | |
| Deposited to Account Number | Check Number | Officer Name _Kraig Ingalsbe_ | |

## SECURITY

**SECURITY INTEREST:** I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

☒ **Inventory:** All inventory which debtor holds for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in debtor's business.

☐ **Equipment:** All equipment including, but not limited to, all machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and recordkeeping equipment, and parts and tools. All equipment described in a list or schedule which debtor gives to Secured Party will also be included in the secured property, but such a list is not necessary for a valid security interest in debtor's equipment.

☐ **Farm Products:** All farm products including, but not limited to:
(a) all poultry and livestock and their young, along with their products, produce and replacements;
(b) all crops, annual or perennial, and all products of the crops;
(c) all feed, seed, fertilizer, medicines, and other supplies used or produced in debtor's farming operations; and
(d) all aquatic goods produced in aquacultural operations.

☐ **Accounts:** All rights debtor has now and may have in the future to the payment of money including, but not limited to:
(a) payment for goods and other property sold or leased or for services rendered, whether or not debtor has earned such payment by performance;
(b) rights to payment arising out of all present and future debt instruments, chattel paper and loans and obligations receivable;
(c) all rights debtor has under any policy of insurance which is a right to payment of a monetary obligation for health care goods or services provided (e.g., health care insurance receivables); and
(d) credit card receivables and license fees.
The above include any supporting obligations, rights and interests (including all liens and security interests) which debtor may have by law or agreement against any account debtor or obligor of debtor.

☐ **Instruments (including Promissory Notes), Documents, Chattel Paper (including electronic chattel paper), Letters of Credit Rights, and Other Rights to Payment:** Any rights, and interests, (including all liens and security interests) which debtor may have by law or agreements against any account debtor or obligor of debtor.

☐ **General Intangibles:** All general intangibles including, but not limited to, payment intangibles, tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, and the right to use debtor's name.

☐ **Deposit Accounts:** All rights debtor has now and may have in the future to any demand, time, savings, passbook or similar account maintained at any financial institution.

☐ **Investment Property:** All rights debtor has now and may have in the future to any certificated or uncertificated security, security entitlement, securities account, commodity contract, commodity account or financial asset.

☐ **Software:** All rights debtor has and may have in the future to any computer program and supporting information provided in connection with the program.

☐ **Commercial Tort Claims:** All rights debtor has now and may have in the future arising out of that certain tort claim more particularly described as follows (Provide description of tort claim)




☐ **Government Payments and Programs:** All payments, accounts, general intangibles, or other benefits (including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance payments, diversion payments, and conservation reserve payments) in which debtor now has and in the future may have any rights or interests and which arise under or as a result of any preexisting, current or future federal or State governmental program (including, but not limited to, all programs administered by the Commodity Credit Corporation and ASCS).

☒ **The Property includes, but is not limited by, the following:**
ALL PRESENT AND FUTURE ACCOUNTS RECEIVABLE AND INVENTORY AS CITED ON UCC #033-2009-03746, FILED 04/28/2009, COBB COUNTY, GEORGIA.




If this agreement covers timber to be cut, minerals (including oil and gas), fixtures or crops growing or to be grown, the legal description is: ·



If applicable, enter real estate description and record owner information:



The Property will be used for a   ☐ personal ☒ business ☐ agricultural ☐ _____ purpose.
Borrower/Owner State of organization/registration (if applicable)  GEORGIA

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY** - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.
**NAME AND LOCATION** - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated herein. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.
**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.
I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.

I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.
I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.
You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent; (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.
I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.
If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.
**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising



(page 2 of 3)

under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.

**PAYMENTS BY LENDER** - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.

**INSURANCE** - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items related to myself, I will do so. You may exercise my rights with respect to obligations of my account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**REMEDIES** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page two.

**FILING AND PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

**RECORD RETENTION** - I acknowledge and agree that you may from time to time retain information about me and documents I sign, including, but not limited to, this agreement and documents related to this loan (collectively, the "documents") electronically (such as in optical, digital or other electronic storage and retrieval system) and destroy the original documents. You and I agree and intend that any copy of any document produced by you from the electronic media shall have the same legal force and effect as the original documents for all purposes and in all circumstances, including, but not limited to, collection, admissibility, authentication, or any other legal purpose.

**ADDITIONAL TERMS OF THE NOTE**

**DEFINITIONS** - As used on pages 1, 2, and 3, "I" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including debtors, guarantors, endorsers, and sureties) who agrees to pay or secure this note (together referred to as "us"). "You," "your" or "Secured Party" means the Lender and its successors and assigns. All references to "this note" or "this agreement" or "this loan" shall mean this Universal Note and Security Agreement.

**APPLICABLE LAW** - The laws of the United States and, to the extent not inconsistent therewith, the laws of the state of Georgia will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION** - I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration. In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, you will describe our agreement on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary). I may prepay a part of, or the entire balance of this loan without a penalty or fee, unless we specify to the contrary on page 1 of this note. The prepayment fee will not be charged on any renewal, extension or modification of the loan or demand for payment due to an event of default.

**INTEREST** - Interest accrues on the principal remaining unpaid from the time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**ACCRUAL METHOD** - The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year". If no accrual

method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you. "Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set-off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set-off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**REAL ESTATE AND RESIDENCE SECURITY** - If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT** - I will be in default if any one or more of the following occur:
(1) I fail to make a payment under this note on time or in the amount due;
(2) I fail to keep the Property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I am in default under this terms of this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued unpaid charges).
(2) You may set-off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not taking any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, regularly or on any other similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee, not to exceed 15 percent of the principal and interest then owed, you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest);
(3) give notice that amounts due have not been paid (notice of dishonor); or
(4) give me notice (prior to seizure of my personal property when you are seeking to foreclose a secured interest in any of my personal property used to secure a commercial transaction.
I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of this note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of this note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree and authorize you to obtain credit information about me from time to time (for example, by requesting a credit report) and to report to others your credit experience with me (such as a credit reporting agency). I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE** - Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this note, or to any other address that you have designated.

**RECORD RETENTION** - I acknowledge and agree that you may from time to time retain information about me and documents I sign, including, but not limited to, this agreement and documents related to this loan (collectively, the "documents") electronically (such as in optical, digital or other electronic storage and retrieval system) and destroy the original documents. You and I agree and intend that any copy of any document produced by you from the electronic media shall have the same legal force and effect as the original documents for all purposes and in all circumstances, including, but not limited to, collection, admissibility, authentication, or any other legal purpose.

(page 3 of 3)

Express © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-GA 2/9/2001  Custom 12/12/2005 SNV000076

EXHIBIT "3"
Profit and Loss Statement

**News Publishing Company & Cherokee Publishing**
Consolidated Monthly Operating Statement

| Account / Description | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Total Calendar 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL REVENUE | 948,695 | 1,044,751 | 966,710 | 950,993 | 1,118,003 | 977,567 | 1,005,187 | 1,065,301 | 992,862 | 1,134,449 | 1,099,822 | 931,591 | 12,227,930 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| Total Compensation | 395,094 | 400,074 | 403,414 | 398,273 | 396,757 | 398,455 | 398,172 | 396,917 | 400,012 | 402,866 | 409,297 | 404,862 | 4,804,193 |
| Payroll Taxes | 29,693 | 28,164 | 30,811 | 26,698 | 32,397 | 29,631 | 27,927 | 26,569 | 25,502 | 25,055 | 26,433 | 25,127 | 334,006 |
| Employee Medical Insurance | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 360,000 |
| Pension Contribution | | | | | | | | | | | | | |
| Workers Comp Insurance | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 168,000 |
| Employee Benefits | 73,693 | 72,164 | 74,811 | 70,698 | 76,397 | 73,631 | 71,927 | 70,569 | 69,055 | 70,433 | 69,127 | 69,127 | 862,000 |
| Production Expense | 462,582 | 414,914 | 445,187 | 486,191 | 439,951 | 453,315 | 419,407 | 443,886 | 447,019 | 467,515 | 472,940 | 404,155 | 5,357,061 |
| Interest Expense - Citizens Fin | 4,255 | 4,255 | 4,255 | 4,255 | 4,255 | 4,255 | 4,255 | 4,255 | 4,265 | 4,255 | 4,255 | 4,255 | 51,070 |
| Utilities | 20,000 | | | | | | | | | | | | 20,000 |
| Adequate Protection - Greater | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Total Adequate Protection | 26,755 | 6,755 | 6,755 | 6,755 | 6,755 | 6,755 | 6,755 | 6,755 | 6,765 | 6,755 | 6,755 | 6,755 | 101,070 |
| Insurance BHMIII | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 7,000 |
| Internet Services | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 8,800 | 105,600 |
| Interurban | 7,500 | 7,500 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,000 |
| Retirement Expenses | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| G&A: Legal | 20,000 | 20,000 | 18,000 | 14,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 152,000 |
| Accounting | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 72,000 |
| Phone Line Charges | 2,588 | 2,498 | 3,235 | 2,907 | 2,400 | 2,635 | 2,516 | 3,315 | 2,650 | 3,200 | 4,994 | 3,200 | 36,138 |
| Phone Maintenance | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 3,058 | 36,696 |
| Phone Lease | | | | | | | | | | | | | |
| Rent | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 9,850 | 118,200 |
| Real Estate Lease | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| Equipment/RealEstate Lease (Heritage) | 2,831 | 2,422 | 1,936 | 3,301 | 1,561 | 7,252 | 5,163 | 1,900 | 1,999 | 2,248 | 2,347 | 1,464 | 34,423 |
| Dues & Subscriptions | | | | | | | | | | | | | |
| Donations | | | | | | | | | | | | | |
| Basketball Festival | | | | | | | | | | | | | |
| Promotions & Publicity | 695 | 890 | 977 | 699 | 545 | 500 | 860 | 325 | 1,515 | 800 | 800 | 800 | 9,406 |
| General and Administrative Expe | 75,888 | 75,685 | 71,522 | 68,282 | 61,881 | 67,761 | 65,814 | 62,915 | 63,539 | 63,623 | 65,516 | 62,839 | 805,464 |
| Total Operating Expense | 1,034,111 | 968,591 | 1,001,688 | 1,030,199 | 981,742 | 999,918 | 982,174 | 981,041 | 986,836 | 1,008,814 | 1,024,941 | 947,738 | 11,929,793 |
| Other Expenses | 11,293 | 12,087 | 11,418 | 11,510 | 10,604 | 13,122 | 12,124 | 13,828 | 14,943 | 11,510 | 14,865 | 10,120 | 147,825 |
| Other Income | 4,648 | 5,406 | 4,976 | 6,842 | 3,823 | 5,862 | 6,875 | 4,307 | 4,000 | 6,000 | 6,235 | 4,000 | 62,976 |
| Profit / (Loss) | (92,062) | 68,479 | (39,420) | (83,874) | 129,281 | (29,611) | 37,764 | 74,740 | (4,918) | 119,125 | 56,252 | (22,267) | 213,468 |

EXHIBIT "4"
Proposed Order

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

In re:   NEWS PUBLISHING COMPANY,            :
    a Georgia corporation,                            :                    Chapter 11
                                                                      :                    Case 13-40002
                                                                      :
    Debtor.                                                       :
    _____ :

**INTERIM ORDER PURSUANT TO SECTIONS
105, 361, 362 AND 363 OF THE BANKRUPTCY CODE
AUTHORIZING THE USE OF CASH COLLATERAL
AND GRANTING ADEQUATE PROTECTION**

Upon the Debtor's Motion for Authority to Use Cash Collateral On An Interim

and Ongoing Basis, to Provide Adequate Protection, and For Expedited Hearing on Use of Cash

Collateral On An Interim Basis and Adequate Protection (the "**Motion**")[1] and an interim hearing

having been held on January _____, 2013 (the "**Interim Hearing**") and upon the entire record

made at the Interim Hearing and this Court having found good and sufficient cause appearing

therefor,

    **IT IS HEREBY FOUND** that:

    A.    On January 1, 2013 (the "**Petition Date**"), News Publishing Company,

a Georgia corporation (**"Debtor"**) filed a voluntary petition (the "**Chapter 11 Case**") for relief

with this Court under Chapter 11 of title 11 of the U.S. Code (the "**Bankruptcy Code**"). The

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

1

Debtor is continuing in possession of its property, and operating and managing its business as

debtor in possession pursuant to Bankruptcy Code §§1107 and 1108.

B.      This Court has jurisdiction over the Chapter 11 Case and the Motion

pursuant to 28 U.S.C. §§157(b) and 1334. Consideration of the Motion constitutes a core

proceeding as defined in 28 U.S.C. §157(b)(2).

C.      Without prejudice to the rights of any other party, including, without

limitation, any hereafter established statutory committee of unsecured creditors appointed

pursuant to §1102 of the Bankruptcy Code (the "**Committee**") (but subject to the limitations set

forth in Paragraph 11), the Debtor admits that:

(1)     Synovus Bank, f/k/a Columbus Bank & Trust, as Successor in interest to
        Citizens First Bank, through Name Change and by Merger with Citizens
        First Bank ("Citizens First Bank") and Debtor are parties to that certain
        Security Agreement, dated April 9, 2009 (as such Agreement has been
        amended from time to time, collectively the "**Citizens First Security
        Agreement**"), pursuant to which Citizens First Bank was granted a
        security interest in all of Debtor's accounts receivable as described
        therein**;**

(2)     In accordance with the terms of the Citizens First Security Agreement
        and other documents executed by Debtor (collectively, the "**Citizens
        First Prepetition Loan Documents**"), Debtor is truly and justly
        indebted to Citizens First Bank, without defense, counterclaim or offset
        of any kind, and that as of the Petition Date, Debtor was liable to
        Citizens First Bank in the aggregate amount of $860,628.17, comprised
        of $851,000 in principal, $4,680.50 in interest, and $4,947.67 late fees,
        together with costs and attorney's fees (collectively, the "**Citizens First
        Prepetition  Obligations**");

(3)     Citizens First Bank, as of the Petition Date, was fully secured.

(4)     Greater Rome Bank ("**Greater Rome Bank**") and Debtor are parties to
        that certain Security Agreement, dated December 1, 2009 (as such
        Agreement has been amended from time to time and including all
        annexes, exhibits and schedules thereto, collectively the "**Greater
        Rome Security Agreement**"), pursuant to which Greater Rome Bank
        was granted a first-priority lien on all inventory, chattel paper,

2

accounts[2], equipment and general intangibles of the Debtor as described therein (the **"Greater Rome Collateral"**);

(5)     In accordance with the terms of the Greater Rome Security Agreement and other documents executed by Debtor, including without limitation that certain Settlement Agreement, dated December 20, 2012 (collectively, the **"Greater Rome Prepetition Loan Documents"**), Debtor is truly and justly indebted to Greater Rome Bank, without defense, counterclaim or offset of any kind, and that as of the Petition Date, Debtor was liable to Greater Rome Bank in the aggregate amount of $ 965,920.62, comprised of $768,596.31 in principal, $71,073.79 in interest, and $126,250.52 in contractual attorneys' fees, costs, and expenses (collectively, the **"Greater Rome Prepetition Obligations"**).

D.     Subject to the limitations set forth in Paragraph 11, the Debtor further admits that the Citizens First and Greater Rome Prepetition Obligations are secured by valid, enforceable, duly perfected liens and security interests granted by Debtor in all of the property described in the Citizens First Prepetition Loan Documents and the Greater Rome Prepetition Loan Documents (collectively, the **"Prepetition Collateral"**). All revenues derived from the Prepetition Collateral that come into Debtor's possession, custody, or control, including but not limited to all cash, credit card receipts, income generated from the operation of the Debtor's business, proceeds, collections of accounts, or other rights to payment (other than any proceeds of claims for relief obtained pursuant to Chapter 5 of the Bankruptcy Code (**"Avoidance Actions"**), if any), constitute proceeds of the Prepetition Collateral and, therefore, is cash collateral of Citizens First Bank and/or Greater Rome Bank (Citizens First Bank and Greater Rome Bank hereinafter sometimes referred to collectively as "Lenders") within the meaning of Bankruptcy Code §363(a) (the **"Cash Collateral"**).

---

[2] Pursuant to that certain Subordination Agreement, dated April 15, 2009, Greater Rome Bank has subordinated its security interest in accounts receivable to the security interest of Citizens First Bank to the extent of seven hundred and fifty thousand and no/100 dollars ($750,000.00).

Active 20243255v2

E.      The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without use of the Cash Collateral. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees and otherwise finance its operations, is essential to the Debtor's continued viability. In addition, the Debtor's critical need for use of Cash Collateral and the Greater Rome Collateral is immediate. In the absence of the use of Cash Collateral and Greater Rome Collateral, the continued operation of the Debtor's business would not be possible, and serious and irreparable harm to the Debtor and its estate would occur. The preservation, maintenance and enhancement of the going concern value of the Debtor are of the utmost significance and importance to a successful reorganization of the Debtor under Chapter 11 of the Bankruptcy Code.

F.      Notice of the Interim Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to Citizens First Bank, (iii) counsel to Greater Rome Bank; (iv) all known secured creditors having an interest in cash collateral, and (v) parties who requested notice pursuant to Fed. R. Bankr. P. 2002. Sufficient and adequate notice of the Interim Hearing and the relief requested in the Motion has been given pursuant to Bankruptcy Code § 102(1), 364(c) and 364(d), and Bankruptcy Rules 2002 and 4001.

G.      The terms of the Cash Collateral and adequate protection arrangements set forth in this Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.      The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001. The permission granted herein to the use of Cash Collateral is necessary

to avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this

Order is in the best interest of the Debtor's estate and creditors as its implementation will, among

other things, allow for the continued operation of the Debtor's existing business and enhance the

Debtor's prospects for successful reorganization.

Based upon the foregoing findings and conclusions, and upon the record made

before this Court at the Interim Hearing, and good and sufficient cause appearing

therefore: **IT IS HEREBY ORDERED** that:

1.      The Motion is granted, subject to the terms and conditions set forth in this

Order.

2.      Subject in all respects to the terms and conditions set forth herein,

including without limitation, those provisions relating to an event of default hereunder, and the

termination of the use of Cash Collateral upon the occurrence of such an event of default and the

giving of notice as set forth herein, Debtor is authorized to use Cash Collateral up through and

including February 28, 2013 (as such date may be extended either by the Court or consensually

by Debtor, Citizens First Bank and Greater Rome Bank from time to time, the "**Termination**

**Date**") but only in the amounts and to the extent that said payments are categorized and

enumerated in the Budget attached hereto and incorporated herein as Schedule 1 (the "**Budget**").

On a monthly basis, expenditures for any individual line item shall not exceed the cumulative

amount set forth in the Budget for such line item for such period by more than ten percent (10%).

3.      Without waiving any of the foregoing, Debtor shall not, without the

consent of Citizens First Bank and Greater Rome Bank or order of the Court, use any Cash

Collateral: (a) for the payment of any pre-petition debts or obligations of Debtor or claims

against Debtor except those authorized by order of the Court, without prejudice to rights of

5

Lenders to object; (b) for the payment of any debts or obligations of Debtor that are not directly related to the management or operation of the Debtor's business; and (c) for prepayment for services that have not yet been rendered, goods which have not yet been received, or any other items of expense for which payment is not currently due, except in the ordinary course of business.

4.      Subject to the terms and conditions set forth in this Order, Citizens First Bank and Greater Rome Bank have and are hereby granted (effective upon the date of this Order and without the necessity of the execution by Debtor of security agreements, financing statements or otherwise), valid and perfected security interests in, and liens upon, (collectively, the **"Replacement Liens")** all present and after-acquired property of Debtor (but only to the extent such existing property was subject to a valid and perfected lien in favor of Citizens First Bank or Greater Rome Bank as of the Petition Date, and to the extent such after-acquired property is of the same character as the Prepetition Collateral), including, without limitation, all revenues derived from the Prepetition Collateral that come into Debtor's possession, custody, or control, including all cash on hand, credit card receipts, income generated from the operation of the Debtor's business, proceeds, collections of accounts, or other rights to payment (other than the proceeds of Avoidance Actions) to the same extent, priority, unavoidability and validity as Citizens First Bank's and Greater Rome Bank's respective security interests and liens in the Prepetition Collateral (collectively, with all proceeds and products of any or all of the foregoing, the **"Postpetition Collateral").** The Replacement Liens shall be deemed valid and perfected notwithstanding the requirements of non-bankruptcy law with respect to perfection. The Replacement Liens shall be supplemental of, and in addition to, any security interest which Citizens First Bank and Greater Rome Bank possess pursuant to the Citizens First and Greater

Rome Prepetition Loan Documents. The Replacement Liens being provided herein are being

given as adequate protection for the diminution in value, if any, of Citizens First Bank's and

Greater Rome Bank's interest in the Prepetition Collateral and shall be subject to the Carve-Out

(as hereinafter defined).

        5.      Any provision of this Order to the contrary notwithstanding, the

Replacement Liens granted to Citizens First Bank and Greater Rome Bank pursuant to this Order

shall be subject and subordinate to carve-outs (collectively the "**Carve-Out")** for (a) quarterly

fees required to be paid pursuant to 28 U.S.C. §1930(a)(6) and (b) any fees payable to the Clerk

of the Bankruptcy Court.

        6.      Citizens First Bank and Greater Rome Bank are granted the following

additional adequate protection for any diminution in the value of Citizens First Bank's and/or

Greater Rome Bank's interests in the Prepetition Collateral from the Petition Date resulting from

the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical

deterioration of the Prepetition Collateral (including Cash Collateral):

        (i)      Citizens First Bank and Greater Rome Bank shall have and are

hereby granted the Replacement Liens subject to the Carve-Out and having the same relative

priority as the prepetition liens held by Citizens First Bank and Greater Rome Bank, as the

case may be; and

        (ii)      The Debtor shall pay to Citizens First Bank as adequate

protection for the use of the Cash Collateral the sum of $4,255.00 a month, the first such

payment being made within five (5) days after entry of this Order. Such payment may be

remitted by Debtor by electronic funds transfer or such other manner as agreed to by Citizens

First Bank. Thereafter, Debtor shall continue to remit to Citizens First Bank such $4,255.00

Active 20243255v2

monthly payments on or before the fifth (5th) day of each month; and

      (iii) The Debtor shall pay to Greater Rome Bank as adequate

protection for the use of the Greater Rome Collateral the sum of 2,500.00 a month, pursuant to

the Settlement Agreement, the first such payment being made to Greater Rome Bank within

five (5) days after entry of this Order and continuing each month thereafter in accordance with

paragraph 6 of the Settlement Agreement.

     7. Except as expressly set forth to the contrary in this Order, the

Replacement Liens granted to Citizens First Bank and Greater Rome Bank pursuant to this Order

shall be prior and senior to all liens and encumbrances of all other secured creditors in and to

such property granted, or arising, subsequent to the date of this Order; provided, however that the

Replacement Liens granted to Citizens First Bank and Greater Rome Bank pursuant to this Order

shall not attach to any Avoidance Actions. The Replacement Liens granted pursuant to this Order

shall constitute valid and duly perfected security interests and liens, and neither Citizens First

Bank nor Greater Rome Bank shall be required to file or serve financing statements, notices of

lien or similar instruments which otherwise may be required under federal or state law in any

jurisdiction, or take any action, including taking possession, to validate and perfect such security

interests and liens; and the failure by Debtor to execute any documentation relating to the

Replacement Liens shall in no way affect the validity, perfection or priority of such Replacement

Liens. If, however, Citizens First Bank or Greater Rome Bank, each in their respective sole

discretion, shall determine to file any such financing statements, notices of lien or similar

instruments, or to otherwise confirm perfection of such Replacement Liens, Debtor is authorized

to cooperate with and assist in such process, the stay imposed by § 3 62(a) of the Bankruptcy

Code hereby is lifted to allow the filing and recording of a certified copy of this Order or any

such financing statements, notices of lien or similar instructions, and all such documents shall be deemed to have been filed or recorded at the time and date of this Order.

   8. The following events, in addition to those identified elsewhere in this Order, shall cause an "Event of Default" at which time Debtor shall not be permitted to use Cash Collateral without the written consent of Citizens First Bank and Greater Rome Bank:

   (a) the Debtor fails to comply with any provision of this Order and, if the default is curable, does not cure any such failure within five (5) days of Citizens First Bank or Greater Rome Bank giving written notice of such failure by electronic mail or fax to Debtor's counsel and to Counsel for the Committee, if any;

   (b) A trustee is appointed or an examiner with the powers of trustee is appointed;

   (c) The above-styled case is converted to a case under Chapter 7 of the Bankruptcy Code;

   (d) a sale of all or substantially all of the Debtor's business is consummated;

   (e) the Debtor ceases substantially all of its business operations; or

   (f) without the prior written consent of the Citizens First Bank and Greater Rome Bank, the Debtor shall file a motion seeking to grant a third party a security interest in, or lien upon, all or part of any property of Debtor that has a priority which is senior to, or equal with, the Prepetition Liens or Replacement Liens of Citizens First Bank or Greater Rome Bank in all or any portion of such property.

   Nothing in this Order shall be deemed to waive the right of the Debtor or any successor thereto to bring a motion requesting that this Court authorize the use of Cash Collateral over the

Active 20243255v2

objection of Citizens First Bank and Greater Rome Bank or any parties' rights to contest any such motion, upon any termination of the Debtor's right to use Cash Collateral pursuant to the terms of this Order due to the occurrence of any of the foregoing events of default.

In the absence of any of the foregoing Events of Default, this Order shall remain in effect until it is terminated, superseded or extended by further order of this Court, provided however that this Order may be extended on the same terms without notice and hearing upon the consent of the Debtor and Citizens First Bank and Greater Rome Bank, which consent shall be filed with the Court.

9.    In the event the Replacement Liens and adequate protection payments granted pursuant to this Order are determined to provide insufficient adequate protection to Lenders, then Lenders shall be entitled to an administrative priority claim under Sections 503(b)(1), 507(a)(1) and 507(b) of the Bankruptcy Code for the amount, if any, by which the protections afforded to Lenders for the Debtor's use of Cash Collateral, the Citizens First Bank Prepetition Collateral or the Greater Rome Bank Collateral proves to be inadequate, and such claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code and shall at all times be senior to the rights of the Debtor and any creditors or claimants in this proceeding or any subsequent proceeding under the Bankruptcy Code, with the exception of all statutory fees of the United States Trustee and costs of the Clerk of Court.

10.    Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtor to Citizens First Bank or Greater Rome Bank incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all use of Cash Collateral and all obligations incurred by the Debtor pursuant hereto

10

prior to the effective date of such stay, modification, reversal or vacation, shall be governed in all respects by the original provisions hereof and Citizens First Bank and Greater Rome Bank shall be entitled to all the rights, privileges and benefits, including without limitation, the Replacement Liens granted herein.

11.    Debtor shall continue to provide to Citizens First Bank and Greater Rome Bank ongoing financial reporting on a commercially reasonable basis and produced by Debtor under the Citizens First Prepetition Loan Documents and the Greater Rome Prepetition Loan Documents, as the case may be. Further, Debtor shall keep records of such character as are reasonably calculated to enable Citizens First Bank to determine at any time the status of all Cash Collateral, and shall permit Lenders, their agents and employees, upon reasonable notice during regular business hours to inspect, audit and make copies of all records and other papers in the possession, custody, or control of Debtor pertaining to the Cash Collateral in which Lenders have an interest. Debtor shall file with the Court an Operating Report by the 20th day of each month for the preceding month's activities as required by the local rules and provide a copy of the same to Lenders or their counsel as Lenders may direct. In addition to the foregoing, Debtor shall comply with all reporting requirements specified in the Citizens First Bank Prepetition Loan Documents not otherwise superseded hereby.

12.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Case, (b) converting the Chapter 11 Case to a Chapter 7 case or (c) dismissing the Chapter 11 Case, and the terms and provisions of this Order as well as the Replacement Liens granted pursuant to this Order shall continue in full force and effect notwithstanding the entry of such order, and such Replacement Liens shall maintain their priority as provided by this Order.

11

13.     The findings contained in paragraphs C and D with respect to the extent, validity and priority of Citizens First Bank's and Greater Rome Bank's liens on the Prepetition Collateral shall be binding upon all parties in interest, provided, however, that the Committee shall have until sixty (60) days after the legal counsel for the Committee is retained to file an adversary proceeding or contested matter (unless, in either case, such deadline is extended by written consent of the Citizens First Bank or Greater Rome Bank, as applicable, or by the Court) asserting any claims or causes of action against Citizens First Bank and/or Greater Rome Bank that are related to, defenses to or challenges to either the validity, extent or priority of the Prepetition Obligations or Citizens First Bank's or Greater Rome Bank's security interests and liens on the Prepetition Collateral in respect thereof. If no such adversary proceeding or contested matter is properly commenced as of such deadline or such extended deadline, as the case may be, Citizens First Bank's and Greater Rome Bank's respective security interest and liens on the Prepetition Collateral shall be deemed legal, valid, binding, perfected and otherwise unavoidable.

14.     Except with respect to the matters expressly governed by this Order and provided that no event of default has occurred and is continuing, entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which Citizens First Bank or Greater Rome Bank may have against the Debtor or third parties, and without prejudice to the right, if any, of Citizens First Bank or Greater Rome Bank to seek relief from the automatic stay in effect pursuant to § 362 of the Bankruptcy Code, or any other relief in the Chapter 11 Case, and the right of the Debtor and any other party in interest to oppose any such relief. The provisions of this Order shall be binding upon and inure to the benefit of Citizens First Bank, Greater Rome Bank, the Debtor, and their respective successors and assigns,

Active 20243255v2

including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case as a legal representative of the Debtor or the Debtor's estate.

15.     For the period during which the Debtor is using the Cash Collateral and Greater Rome Collateral consensually, the Debtor shall have no right to assess the Prepetition or Postpetition Collateral pursuant to 11 U.S.C. § 506(c).

16.     The rights, remedies, powers and privileges conferred upon Citizens First Bank and Greater Rome Bank pursuant to this Order shall be in addition to and cumulative with those contained in the Loan Documents. Nothing in this Order is intended to limit, restrict, eliminate or modify any rights or remedies provided to Citizens First Bank and Greater Rome Bank under their loan documents.

17.     Bankruptcy Rule 9006(a) shall apply in computing any time period specified in this order.

18.     The Debtor shall, within two business days of entry of this Order, mail copies of a notice of the entry of this Order, together with a copy of this Order, to any party which has filed prior to such date a request for notice with this Court and to counsel for any statutory committee of unsecured creditors appointed pursuant to § 1102 of the Bankruptcy Code.

19.     The Final Hearing to consider the Motion will be held on _____, 2013 at _____ a.m. prevailing Eastern time.

20.     Objections to entry of a final order granting the Motion shall be filed with the Court and served for receipt upon Debtor's counsel, Smith Conerly LLP, 402 Newnan Street, Carrollton, Georgia 30117   (Attn: J. Nevin Smith, Esq.), (i) the Office of the United States Trustee for the Northern District of Georgia; (ii) counsel to the Official Committee of Unsecured

Creditors appointed in this case or, if one is not appointed, upon those creditors holding the 20 largest unsecured claims against the Debtor; (iii) counsel to Citizens First Bank, Brinson Askew Berry Seigler Richardson & Davis LLP (Attn: Thomas D. Richardson, Esq.), P.O. Box 5007, Rome, Georgia 30162-5007, and (iv) counsel to Greater Rome Bank, Troutman Sanders, LLP, 600 Peachtree St. NE, Suite 5200, Atlanta, Georgia 30308 (Attn: Mathew R. Brooks, Esq.) by 4:00 P.M. on _____, 2013.

Dated: January ___, 2013

 

_____

Hon. Mary Grace Diehl
UNITED STATES BANKRUPTCY JUDGE

This Order prepared and
presented by:

SMITH CONERLY LLP

By:_____
   J. Nevin Smith
   Georgia Bar No. 661110

Attorneys for Debtor

402 Newnan Street
Carrollton, Georgia 30117
(770) 834-1160

Consented to by:

BRINSON ASKEW BERRY SEIGLER RICHARDSON & DAVIS LLP


By:_____
   Thomas D. Richardson
   Georgia Bar No. 604313

P.O. Box 5007
Rome, Georgia 30162-5007
trich@brinson-askew.com

Attorneys for Citizens First Bank

TROUTMAN SANDERS LLP

By:_____
    Matthew R. Brooks
    Georgia Bar No. _____

600 Peachtree St. NE
Suite 5200
Atlanta, Georgia 30308
Matthew.Brooks@troutmansanders.com

Attorneys for Greater Rome Bank