UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

In re:   NEWS PUBLISHING COMPANY,  :
a Georgia corporation,              :        Chapter 11
                                    :        Case 13-40002
                                    :
Debtor.                             :
_____:

DECLARATION OF BURGETT H. MOONEY, III, PRESIDENT
OF NEWS PUBLISHING COMPANY IN SUPPORT OF
DEBTOR'S FIRST DAY PLEADINGS

I, Burgett H. Mooney, III, hereby state and affirm as follows:

1.  I am the President of News Publishing Company (the "Debtor"). I have served as the President of Debtor since 1977. In my capacity as the Debtor's President, I am familiar with the Debtor's books and records, financial affairs, business and operations.

2.  I have personal knowledge of the matters set forth herein or have otherwise obtained such knowledge from a review of the Debtor's books and records or from the Debtor's management and employees that generally report to me in the ordinary course of the Debtor's businesses.

3.  I am authorized to make the statements set forth herein and submit this Declaration.

**BACKGROUND**

4.  On January 1, 2013 (the "Petition Date"), the Debtor filed a voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") thereby commencing this chapter 11 case. The Debtor is operating its business and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1

A. **The Debtor's Business**

5. Debtor currently publishes one (1) paid daily paper, five (5) paid weekly newspapers, seven (7) free newspapers, shoppers and niche publications and six (6) newspaper and niche websites located in urban, suburban and rural markets. Cherokee Publishing Company, Inc., an Alabama corporation ("Cherokee") is a wholly owned subsidiary of Debtor. Cherokee currently publishes one (1) paid weekly paper and one (1) niche website. Debtor also operates a substantial commercial printing operation. The Debtor's and Cherokee's publications, websites and printing businesses (collectively, the "Business") are a fully-functional going concern that provides services to meet the needs of their customers.

6. The Debtor's publications have a very loyal readership, provide in-depth local market coverage and possess high audience penetration rates and a high demographic quality of readers. The Debtor's publications, therefore, are an attractive and cost-effective means for advertisers to reach targeted customers. Over 1,500 business and individuals advertise in the Debtor's various publications.

7. The Debtor's publications are as follows:

> Rome, Georgia - Rome News Tribune; 14,000 circulation daily
> Centre, Alabama - Cherokee County Herald; 2,500 circulation weekly
> Calhoun, Georgia – Calhoun Times; 5,000 circulation weekly
> Cedartown, Georgia – Cedartown Standard; 2,400 circulation weekly
> Rockmart, Georgia – Rockmart Journal; 1,600 circulation weekly
> LaFayette, Georgia – Walker County Messenger; 2,600 circulation weekly
> Ringgold, Georgia – Catoosa County News, 1,800 circulation weekly

8. The Business Publications are generally circulated weekly or bi-weekly. Each operation also produces special publications focusing on specific industries and issues relevant to the particular local business community. The Debtor's Business Publications occupy a specific and largely uncontested niche in the communities in which they serve.

### B. The Debtor's Senior Management

9. The Debtor's current management team has significant experience in the newspaper publishing business, both with the Debtor and with other newspaper companies.

10. Debtor's corporate office is located in Rome, Georgia, and serves as the location of the Debtor's President, Burgett H. Mooney, III, Otis Rayburn, the Debtor's Vice President of Operations, and Vice President of Production, Doug Crow. The Debtor's accounting, tax, human resources, technology, payroll, general ledger, accounts payable/receivable and cash management functions are also located at the Debtor's principal office in Rome, Georgia and is led by Company Controller, Jim Turner.

11. The following is a list of the Debtors' existing senior management:

(a) **Burgett H. Mooney, III** *(President)* - Mr. Mooney has served as President of the Debtor since 1977. He is currently responsible for all functions of the Debtor's management. During his tenure, Mr. Mooney has cultivated several growth prospects for Debtor and has overseen the growth of News Publishing Company from one product (Rome News-Tribune) to 22 products today including 7 newspapers and 6 websites based in Northwest Georgia and Northeast Alabama. Mr. Mooney is a graduate of Darlington School (1968) and received his B.B.A in Economics from the University of Georgia in 1973. Mr. Mooney is a past president of the Georgia Press Association, a past member of the Board of Trustees of Darlington School and has served on numerous committees of Southern Newspaper Publisher Association and the Georgia Press Association. Mr. Mooney is a member of the President's Advisory Trust Board Grady College of Journalism and Mass Communication at the University of Georgiaand was named as one of the 100 Most Influential Georgians by Georgia Trend Magazine in 2008.

3

**(b) Otis Rayburn** *(Vice President of Operations)* - Mr. Rayburn joined the Debtor in 1998. Mr. Rayburn is responsible for the daily operations of Debtor. Mr. Rayburn received his B.B.A. from Georgia State University in 1979. Previously, Mr. Rayburn was with Thomson Newspapers from 1982-1998. Mr. Raburn's previous experience includes the following:

1979-1984 Advertising Director Griffin Daily News

1984-1986 Advertising Director Valdosta Daily Times

1986-1988 Publisher Americus Times Recorder

1988-1997 Publisher Griffin Daily News

1997-1998 President NW GA Strategic Marketing Group, Dalton, Ga

Publisher Dalton Daily Citizen News

Mr. Rayburn is a member of the Georgia Press Association, the Southern Newspapers Publishers' Association, the Inland Press Association and Rotary Club International. Mr. Raburn is a Board Member of the Technical College System of Georgia (since 2007) and is on the board of a number of local technical colleges in the Technical College System of Georgia.

**(c) Doug Crow** *(Vice President of Production)* - Mr. Crow has extensive experience in newspaper production. Mr. Crow has been with the Debtor since 2008. He gained extensive newspaper knowledge as Director of Operations, Circulation, and Project Manager at the Torrance County Daily Breeze (Lang Newspaper Group) from 1987 to 2007. Mr. Crow is a valuable director of the important deadline driven production business of Debtor.

C. **The Debtors' Pre-Petition Debt Structure**

12. **First Lien Credit Agreement**

Synovus Bank, f/k/a Columbus Bank & Trust, as Successor in interest to Citizens First Bank, through Name Change and by Merger with Citizens First Bank ("Citizens First Bank") and Debtor are parties to that certain Security Agreement, dated April 9, 2009 (as such Agreement (the "First Lien Credit Agreement"), pursuant to which Citizens First Bank

4

was granted a security interest in all of Debtor's accounts receivable. In accordance with the terms of the First Lien Credit Agreement and other documents executed by Debtor, Debtor is indebted to Citizens First Bank in the aggregate amount of $860,628.17, comprised of $851,000 in principal, $4,680.50 in interest, and $4,947.67 late fees, together with costs and attorney's fees.

13. **Second Lien Credit Agreement**

Greater Rome Bank ("Greater Rome Bank") and Debtor are parties to that certain Security Agreement, dated December 1, 2009 (the "Second Lien Credit Agreement"), pursuant to which Greater Rome Bank was granted a first-priority lien on all inventory, chattel paper, accounts, equipment and general intangibles of the Debtor as described therein (the "Greater Rome Collateral"). Pursuant to that certain Subordination Agreement, dated April 15, 2009, Greater Rome Bank has subordinated its security interest in accounts receivable to the security interest of Citizens First Bank to the extent of seven hundred and fifty thousand and no/100 dollars ($750,000.00). In accordance with the terms of the Second Lien Credit Agreement and other documents executed by Debtor, including without limitation that certain Settlement Agreement, dated December 20, 2012 (collectively, the "Second Lien Credit Documents"), Debtor is indebted to Greater Rome Bank in the aggregate amount of $768,596.31 in principal, $59,032.46 in interest, plus any then-outstanding fees and expenses.

D. **Events Leading To The Debtors' Chapter 11 Filings**

14. The Debtor has experienced continuing financial difficulty as a result of significant decreases in advertising revenue between October, 2008 and December, 2012 due to negative market conditions. The Debtor's largest advertising revenue category is

5

local retail advertising and the effect of changes in retail sales have adversely impacted Debtor's revenue, particularly in Debtor's community newspapers.

15. The Debtor is currently in default under both the First Lien Credit Agreement.

16. The Debtor has both eliminated unprofitable publications and downsized staffing for its operations in response to its ongoing liquidity needs. Although the Debtor has considered an out-of-court restructuring or a non-bankruptcy asset sale, it became clear to the Debtor's management and Board of Directors that an out-of-court restructuring could not be accomplished sufficiently quickly to meet the Debtor's liquidity needs.

17. Accordingly, the Debtor has commenced this chapter 11 proceeding in an effort to maximize and protect the value of the Debtor's assets for the benefit of its creditors, employees, equity security holders and other parties in interest.

E. **Information Relating to the Continuation of The Debtor's Businesses**

18. The Debtor intends to continue the operation of its business and the management of its properties as debtor and debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

19. The estimated amount of the Debtor's payroll obligations to employees (including leased employees) for the 30-day period following the Petition Date is approximately $380,000.00. The Debtor pays its employees on a weekly/bi-weekly basis in the approximate amount of $190,000.00 bi-weekly. In addition, compensation and reimbursements to independent contractor newspaper carriers ("Carriers") averages $90,000 per month. All Carriers are paid at rates for their routes negotiated with such Carriers on the basis of the number of newspapers on their route, the geographic length of the route and certain other factors.

20. The Debtor does not anticipate making any payments to their financial consultants, The Interlochen Group, LLC ("Interlochen") during the 30-day period following the Petition Date. Interlochen, however, will be accruing amounts owing to them by the Debtor for services rendered in the 30-day period following the Petition Date. Interlochen will be requesting approval and payment for services rendered in the 30-day period following the Petition Date in an interim compensation motion to be filed with this Court.

## THE DEBTOR'S FIRST DAY PLEADINGS

21. To enable the Debtor to continue operating during the pendency of their Chapter 11 Case, the Debtor has requested various forms of exigent relief by means of First Day Pleadings filed contemporaneously with this Declaration. The following First Day Pleadings have been filed by the Debtor:

**Debtors' Application for Order Authorizing the Retention and Employment of Smith Conerly LLP as Bankruptcy Counsel, *Nunc Pro Tune* as of the Petition Date, Pursuant to Bankruptcy Code Sections 327(a) and 1107(a), and Fed. R. Bankr. P. 2014(a) and 2016(a)**

**(the "Smith Conerly Application")**

22. The Debtor seeks the entry of an order authorizing the employment and retention of Smith Conerly LLP ("Smith Conerly") as the Debtors' bankruptcy counsel in these Chapter 11 Case *nunc pro tunc* to the Petition Date.

7

23. The Debtor selected Smith Conerly based on the firm's familiarity with the Debtor's corporate history, debt structure, business and litigation matters, and other major operational issues. Additionally, Smith Conerly' attorneys have an existing familiarity and relationship with the Debtor's management as a result of having worked with the Debtor previously both in an attempt to avoid filing bankruptcy and later to prepare the Debtor's bankruptcy filings.

24. Smith Conerly has extensive experience, knowledge and resources in the area of debtors' and creditors' rights. Moreover, Smith Conerly has the ability to commit substantial resources to legal problems on an urgent basis. Under the circumstances, the Debtor has determined that Smith Conerly is particularly well qualified to represent the Debtor in this Chapter 11 Case.

25. I believe that the retention of Smith Conerly, with its knowledge of, and experience with, the Debtor, will assist in the efficient administration of this estate and is, therefore, in the best interests of the Debtor and its estate.

**Application for Order Authorizing the Retention and Employment of Interlochen Group, LLC, *Nunc Pro Tunc* as of the Petition Date, as Financial Advisor to the Debtor Pursuant to Bankruptcy Code Sections 327, 328, 330 and 331, and Fed. R. Bankr. P. 2014(a) and 2016
(the "Interlochen Application")**

26. The Debtor seeks the entry of an order authorizing the retention of Interlochen Group, LLC ("Interlochen") to serve as the Debtor's financial advisor in connection with this chapter 11 case *nunc pro tunc* to the Petition Date.

27. In light of the size and complexity of the Debtor's business, as well as the exigencies of the circumstances, the Debtor has determined that it will require the services of experienced financial advisors and that such financial advisors will significantly enhance the debtor's attempts to protect and maximize the value of the Debtor's business and other assets.

28. The Debtors need assistance in collecting and analyzing financial and other information in relation to the Chapter 11 case. The Debtor has selected Interlochen as their financial advisors because of the firm's diverse experience and extensive knowledge in the field of bankruptcy. Interlochen has considerable experience with rendering similar services to debtors and other parties in numerous chapter 11 cases. As such, Interlochen is qualified to perform the work required in this case.

29. Additionally, as a result of the pre-petition work that Interlochen has performed on behalf of the Debtor, Interlochen has already obtained significant first-hand knowledge of the Debtor and its business operations, and is intimately familiar with the Debtor's financial affairs, debt structure, operations and related matters. Interlochen's professionals have worked closely with the Debtor and its attorneys, Smith Conerly, and have developed relevant experience and expertise regarding the Debtor which will assist Interlochen in helping the Debtor navigate through this chapter 11 case.

30. Under the circumstances, I believe that the retention of Interlochen is in the best interests of the Debtor and its estate.

## Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Official Committee Members

### (the "Interim Compensation Motion")

31.  The Interim Compensation Motion seeks to establish procedures for: (a) the allowance and payment of compensation for services rendered and reimbursement of expenses incurred by attorneys and other professionals (the "Professionals") who will be required to file applications with this Court pursuant to sections 330 and 331 of the Bankruptcy Code and (b) allowance and reimbursement of expenses incurred by members of any official committee of unsecured creditors appointed in this Chapter 11 case.

32.  The Debtor seeks approval of the procedures set forth in the Interim Compensation Motion to compensate and reimburse the Professionals on a monthly basis. The Debtor believes that establishing the procedures set forth in the Interim Compensation Motion will streamline the administration of the Debtor's chapter 11 case and otherwise promote efficiency for the Court, the Office of the United States Trustee and all parties in interest.

33.  Therefore, I believe that approval of the Interim Compensation Motion is in the best interests of the Debtor, its estate and creditors.

**Debtor's Motion for an Order Authorizing, But Not Requiring (I) Payment of Prepetition Employee Wages, Salaries, and Commissions; (II) Reimbursement of Pre-Petition Employee Business Expenses; (III) Contributions to Pre-Petition Employee Benefit Programs and Continuation of Such Programs; (IV) Payment of Workers' Compensation Obligations and Other Insurance Premiums; (V) Payment of Pre-Petition Tax and Other Withholdings to Third-Parties, (VI) Payment of Pre-Petition Newspaper Carrier Compensation, and (VII) Related Relief**

**(the "Wage Motion")**

34. On the Petition Date, the Debtor employed approximately 143 full time employees (each an "Employee" and collectively, the "Employees"), eighty-four (84) of which are compensated on an hourly basis and fifty-nine (59) of which are compensated on the basis of a fixed salary. As of the Petition Date, the Debtor had independent contractor relationships with approximately ninety-eight individuals who deliver newspapers to customers of the Debtor on routes established by the Debtor (the "Carriers"). Pursuant to the Wage Motion, the Debtors seek authority, but not the obligation, to pay Employees' accrued pre-petition wages and salaries that were earned but not yet paid, together with associated withholding and payroll taxes (the "Unpaid Compensation"), reimbursable business expenses incurred by employees in the ordinary course of business (the "Expenses") and other employee benefits, (the "Benefits" and together with the Unpaid Compensation and the Expenses, the "Employee Obligations"), in amounts not exceeding the $11,725.00 priority cap established by section 507(a)(4) of the Bankruptcy Code, as well as accrued pre-petition Carrier compensation that was earned but not yet paid on the Petition Date (the "Carrier Obligations"). The Debtor estimates that, as of the Petition Date, current Carriers had outstanding approximately $32,500.00 in accrued pre-petition payments which were earned by but were not yet paid. (As used herein, the Employee Obligations and the Carrier Obligations are hereinafter referred to as the "Employee and Carrier Obligations").

11

35.     The continued and uninterrupted service of their Employees and Carriers is critical to preserve the viability of a successful reorganization and to maximize the value of the Debtor's estate for their stakeholders. Employee and Carrier morale is, understandably, low upon a chapter 11 filing. However, it is during this time that Employees' and Carrier's dedication, knowledge and cooperation are especially necessary to the success of the Debtor's chapter 11 efforts. Accordingly, the Debtor requests that they be authorized to pay the Employee and Carrier Obligations without disruption.

36.     The Debtor's failure to honor the Employee and Carrier Obligations would cause undue personal hardships for many of the Employees and Carriers as many will be unable to meet their financial obligations and maintain their personal health and well-being. Such hardships may cause many Employees and Carriers to seek other employment, possibly causing irreparable disruption and harm to the Debtor's operations.

37.     Accordingly, I believe that the relief requested in the Wage Motion is in the best interest of the Debtor and its estate.

**Debtors' Motion for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105
and 366 of the Bankruptcy Code (I) Finding Utilities Adequately
Assured of Future Performance, (II) Enjoining Utilities From Altering,
Refusing, Discontinuing, or Interfering With Utility Service, and
(III) Establishing Procedures For Determining Requests For
<u>Additional Adequate Protection</u>**

**(the "Utilities Motion")**

38.     The Debtor seeks the entry of interim and final orders: (a) enjoining the Debtor's utility providers (each a "Utility" and collectively, the "Utilities") from altering, refusing, discontinuing or interfering with service to the Debtor, (b) finding that the Utilities are adequately assured of future performance based, among other things, on the Debtor's establishment of a security deposit in a segregated account equal to 50% of the average monthly bill for each Utility, without prejudice to the Debtor's rights to adjust such amounts and the Utilities' rights to request additional adequate assurance and (c) establishing certain procedures for determining requests for additional adequate assurance.

39.     Uninterrupted services from the Utilities is critical to the Debtor's ongoing operations. Any disruption in utility services at any of the Debtor's facilities would be detrimental to the Debtor's business and would divert the Debtor's attention away from focusing on the successful administration of its chapter 11 case. Therefore, it is critical that the Utilities be ordered to provide uninterrupted services to the Debtor, subject only to the Debtor's provision of adequate assurance as set forth in the Utilities Motion.

40.     Accordingly, I believe that the relief requested by the Utilities Motion is in the best interests of the Debtor and its estate and is necessary to protect the Debtor from the irreparable harm that would otherwise result from losses of utility services.

**Debtors' Motion for an Order Authorizing, But Not Directing,
Payment of Pre-Petition Claims of Critical Vendors**

**(the "Critical Vendor Motion")**

41.  By this motion, the Debtor seeks an order authorizing, but not requiring, them to (a) pay the pre-petition claims of certain critical vendors that have provided products or services to the Debtor (the "Critical Vendors"), (b) direct all banks and other financial institutions on which checks or electronic funds transfers used by the Debtor to pay the Critical Vendors before the Petition Date are drawn (collectively, the "Banks") to receive, process, honor and pay, to the extent of funds on deposit, any and all checks presented for payment of, and to honor all electronic funds transfer requests made by the Debtor related to, the claims that the Debtor requests authority to pay in this Motion, upon the receipt by each such bank of notice of such authorization without further order of the Court and (c) reissue any such check or retransfer any such funds that any bank has refused to honor.

42.  The Debtor seeks to pay the pre-petition claims of the Critical Vendors (the "Critical Vendor Claims") only (a) where nonpayment of such claims would lead to the cessation of the delivery of products and/or the provision of services resulting in a shutdown of all or a portion of the Debtor's operations, including but not limited to the case(s) of vendors whose financial condition is sufficiently tenuous that payments of pre-petition accounts are essential to ensure continuous delivery of goods or services, or (b) where there is no reasonable alternative source for the products or services provided by such Critical Vendor. Thus, the Debtor submits that the relief requested is narrowly tailored to facilitate the Debtor's reorganization process. The Debtor believes the Critical Vendors

will likely, among other things, refuse to provide products or services or refuse to provide products or services on reasonable credit terms absent payment of the Critical Vendor Claims.

43. Payment of the Critical Vendor Claims is further justified because a substantial portion of such claims arise out of goods or services received by the Debtor in the ordinary course of business within 20 days of the Petition Date and are therefore entitled to administrative expense priority under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code.

44. The Debtor purchases goods and services from certain vendors with whom the Debtor are not affiliated. The services that these Critical Vendors provide are essential to the daily operations of the Debtor's business. In the Debtor's business judgment, it would not be possible to replace the Critical Vendors within a reasonable time and on terms as beneficial to the Debtor as their current terms. In addition, the process of finding replacement vendors could disrupt the Debtor's operations, to the detriment of the Debtor's estate and creditors. Moreover, the Debtor proposes conditioning payments to some Critical Vendors on those vendors' agreeing to continue to provide goods and services on ordinary credit terms.

45. The Debtor has determined that the authority to pay the Critical Vendor Claims is critical to their efforts to continue their businesses. The Debtors depend on the continued delivery of goods and services by the Critical Vendors to transition seamlessly into chapter 11, maintain operations and preserve value for the estates' creditors. The payment of the Critical Vendor Claims as requested herein is intended to ensure there is no disruption in the Debtors' ability to obtain the products and services necessary to the

operation of their businesses and the preservation and protection of their properties.

**Debtor's Motion for Authority to Use Cash Collateral On An
Interim and Ongoing Basis, To Provide Adequate Protection,
and For Expedited Hearing on Use of Cash Collateral On An
<u>Interim Basis and Adequate Protection</u>
(the "Cash Collateral Motion")**

46. The ability of the Debtor to obtain sufficient working capital and liquidity through the use of cash collateral is vital to the preservation and maintenance of the going concern values of the Debtor. Accordingly, the Debtor has an immediate need to obtain have access to cash collateral in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of its business operations and preserve and maximize the value of the assets of its estate in order to maximize the recovery to all of the Debtor's creditors.

47. I have reviewed each of these First Day Pleadings, including all annexed exhibits to such First Day Pleadings, and I believe that the relief requested therein is critical to the success of the Debtor's Chapter 11 Case and is in the best interest of the Debtor, its estate and creditors.

48. I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Sworn to and subscribed before
me this 3rd day of January, 2013.

_____                                  _____
Notary Public                                                                                   BURGETT H. MOONEY, III

State of Georgia
County of Carroll

Notary Public, Haralson County, Georgia
My Commission Expires Sept. 8, 2013

16